Barry I. Levy, Esq. (BL 2190)
Michael A. Sirignano, Esq. (MS 5263)
Garin Scollan, Esq. (GS 7780)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY
COMPANY,

                             Plaintiffs,

       -against-

BI COUNTY MEDICAL DIAGNOSTICS, P.C.,
JACQUELINE M. LEWIS, M.D.,
APOLLO MEDICAL DIAGNOSTICS, PLLC,
ISLAND MEDICAL DIAGNOSTICS, PLLC,
RICHARD C. KOFFLER, M.D., and
JOHN DOE DEFENDANTS "1" – "10",

                            Defendants.

-------------------------------------------------------------------X

Docket No.:_____ (       )

**Plaintiff Demands a Trial
by Jury**

## COMPLAINT

Plaintiffs  Government  Employees  Insurance  Company,  GEICO  Indemnity  Company,

GEICO  General  Insurance  Company  and  GEICO  Casualty  Company  (collectively  "GEICO"  or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $70,000.00 that the Defendants wrongfully stole from GEICO, and further seeks to extinguish more than $752,000.00 in pending fraudulent billing, resulting from the submission of thousands of fraudulent charges relating to medically unnecessary services, specifically range of motion testing and muscle strength testing (the "Fraudulent Services") that purportedly were rendered to individuals involved in automobile accidents and eligible for coverage under policies of automobile insurance that were issued by GEICO ("Insureds").

2.      The Defendants, in an attempt to conceal the volume of their fraudulent billing, submitted billing for the Fraudulent Services under the names of three professional corporations, Bi County Medical Diagnostics, P.C. ("Bi County PC"), Apollo Medical Diagnostics, PLLC ("Apollo PC"), and Island Medical Diagnostics, PLLC ("Island PC") (collectively, the "PC Defendants").  Bi County PC is nominally owned by defendant Jacqueline M. Lewis, M.D. ("Dr. Lewis"), while Apollo PC and Island PC are nominally owned by Richard C. Koffler, M.D. ("Dr. Koffler").   Neither Dr. Lewis nor Dr. Koffler truly owned or controlled any of the PC Defendants, nor provided any medical services themselves through the professional corporations.

3.      The PC Defendants, rather than being truly owned and controlled by licensed medical professionals, were instead used by unlicensed laypersons to render, or purport to render, bogus diagnostic testing services to Insureds in order to generate profits without regard to genuine patient care.  The unlicensed laypersons caused the PC Defendants to operate on an iterant basis at a series of No-Fault "medical mills" located throughout New York, where the PC Defendants were supplied with a steady stream of "patients" through no effort of either Dr.

Lewis or Dr. Koffler, but rather through illegal fee splitting, kickback, and referral arrangements. These illegal arrangements enabled the Defendants to submit inflated and excessive charges for the Fraudulent Services billed under the PC Defendants' tax identification numbers in order to exploit New York's No-Fault insurance system for financial gain.

4.     By virtue of the Defendants' acts, GEICO seeks not only damages but also a declaration that it is not legally obligated to pay reimbursement of more than $752,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants, because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds;

(ii)     The PC Defendants have been unlawfully owned and controlled by unlicensed laypersons, not by licensed physicians who actually practiced medicine through them and, therefore, were ineligible to bill for or to collect No-Fault Benefits;

(iii)     The Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, were ineligible to bill for or to collect No-Fault Benefits; and

(iv)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.     The Defendants fall into the following categories:

(i)     Bi County PC, Apollo PC, and Island PC (collectively, the "PC Defendants"), are three New York professional corporations through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)     Dr. Lewis and Dr. Koffler (collectively the "Physician Defendants") are licensed medical professionals who served as the sham owners of the PC

Defendants in order to support the submission of billing for the Fraudulent Services billed under the names of the PC Defendants.

(iii)     John Does "1" through "10" (collectively the "Management Defendants") are not and never have been licensed physicians.  Even so, they secretly and unlawfully controlled and/or derived economic benefit from the PC Defendants; conspired to pay kickbacks for patient referrals and facilitated illegal fee-splitting and referral arrangements; and caused Insureds to be subjected to the Fraudulent Services pursuant to a pre-determined fraudulent treatment protocol designed to maximize profits without regard to genuine patient care.

6.      As discussed below, Defendants at all relevant times have known that (i) the PC Defendants were unlawfully controlled by unlicensed laypersons and illegally shared fees with them, and, therefore, were ineligible to bill for or to collect No-Fault Benefits; (ii) the Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, the PC Defendants were ineligible to bill for or to collect No-Fault Benefits; (iii) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds; (iv) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the PC Defendants were nominally owned on paper by physicians who did not practice medicine through the professional corporations.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the PC Defendants.

4

8.      The charts annexed hereto as Exhibits "1" – "3" sets forth the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

9.      The Defendants' fraudulent scheme, which commenced in or about 2015, has continued uninterrupted through present day.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $70,000.00.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

11.     Defendant Dr. Lewis resides in and is a citizen of New York.  Dr. Lewis was licensed to practice medicine in New York on April 13, 1994, and serves as the sham or "paper" owner of Bi County PC.

12.     Defendant Bi County PC is a New York professional corporation incorporated on or about June 26, 2015, with its principal place of business located at 338 Jericho Turnpike, Syosset, New York, and purports to be owned and controlled by Dr. Lewis.  Bi County PC was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers from August 2015 through January 2017.

13.     Defendant Dr. Koffler resides in and is a citizen of New York.  Dr. Koffler was licensed to practice medicine in New York on July 2, 1996, and serves as the sham or "paper" owner of Apollo PC and Island PC.

14.     Defendant Apollo PC is a New York professional corporation incorporated on or about March 16, 2017, with its principal place of business located at 6800 Jericho Turnpike, Syosset, New York, and purports to be owned and controlled by Dr. Koffler.  Apollo PC was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers from June 2017 through February 2018.

15.     Defendant Island PC is a New York professional corporation incorporated on or about August 9, 2017, with its principal place of business located at 6800 Jericho Turnpike, Syosset, New York, and purports to be owned and controlled by Dr. Koffler.  Island PC is being used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers from February 2018 through the present.

16.     Upon information and belief, the Management Defendants, named herein as John Doe Defendants "1" – "10," reside in and are citizens of New York.  The Management Defendants are unidentifiable unlicensed and non-physician individuals and entities who knowingly participated in the fraudulent scheme by, among other things: unlawfully controlling and/or deriving economic benefit from the PC Defendants; conspiring to pay kickbacks for patient referrals and facilitating illegal fee-splitting and referral arrangements; and causing Insureds to be subjected to the Fraudulent Services pursuant to a pre-determined fraudulent treatment protocol designed to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No Fault Laws and Licensing Statutes

19.     GEICO underwrites automobile insurance in New York.

New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

20.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

21.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days

of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

22.    In New York, claims for No-Fault benefits are governed by the New York Workers' Compensation Fee Schedule (the "Fee Schedule").

23.    When a health care provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

24.    Pursuant to the No-Fault Laws, a health care provider is not eligible to bill for or to collect No-Fault Benefits if it unlawfully incorporated or fails to meet any New York State or local licensing requirements necessary to provide the underlying services.

25.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

26.    In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a

8

professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

27.    New York law also prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals and engaging in illegal fee splitting arrangements, and further prohibits unlicensed persons not authorized to practice a profession from sharing in the fees for professional services.

28.    Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed.

29.    Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, if it pays or receives unlawful kickbacks in exchange for patient referrals, shares fees for professional services with unlicensed persons, and/or is "owned" by professionals who do not engage in the practice of their profession through the professional corporation.

30.    In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with material

licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

31.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits.  There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

32.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services.  Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

33.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   **The Defendants' Fraudulent Scheme**

### A.   **Overview of the Scheme**

34.     Beginning in 2015, the Defendants masterminded and implemented a complex fraudulent scheme in which the Defendants used the PC Defendants' tax identification numbers to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise unreimbursable services – *i.e.*, the Fraudulent Services.

35.     The Fraudulent Services billed through the PC Defendants consist of purported range of motion testing and muscle strength testing rendered to Insureds, which tests were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit Insureds.

36.     The Physician Defendants never actually examined any of the Insureds on behalf of the PC Defendants; never rendered any of the actual testing to any of the Insureds on behalf of the PC Defendants; and never actually exercised any medical judgment in connection with the rendering of the Fraudulent Services.

37.     As described more fully below, although the PC Defendants nominally were owned on paper by licensed physicians – the Physician Defendants – in actuality the PC Defendants were secretly and unlawfully controlled by the Management Defendants in contravention of New York law, and were used by the Management Defendants as vehicles to submit large-scale fraudulent billing to GEICO and other insurers for the Fraudulent Services.

38.     The Management Defendants and the Physician Defendants utilized the PC

Defendants to evade detection of their fraudulent scheme and circumvent any investigation into their fraudulent treatment and billing protocols.

39.     By utilizing multiple professional corporations to submit billing for the Fraudulent Services to insurers, the Management Defendants and the Physician Defendants sought to limit the duration of time through which any one professional corporation would be used to submit billing for the Fraudulent Services.

**B.     The Unlawful PC Defendants**

40.     In furtherance of the fraudulent scheme, the Management Defendants recruited Dr. Lewis, a licensed physician who was willing to sell the use of her medical license to the Management Defendants so that they could secretly and unlawfully submit fraudulent No-Fault billing to GEICO and other insurers.

41.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Bi County to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Lewis.

42.     In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Lewis agreed to falsely represent in the certificate of incorporation and related filings with New York State for Bi County PC, that she was the true shareholder, director, and officer of Bi County PC and that she truly owned, controlled, and practiced through the professional corporation.  Dr. Lewis did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

43.     In furtherance of the scheme to submit billing for the Fraudulent Services, in June

2015, the Defendants caused Bi County PC to be incorporated.

44.     The Defendants thereafter submitted billing to GEICO through Bi County PC for the Fraudulent Services during the period of August 2015 to January 2017. See Exhibit "1".

45.     Bi-County PC used a street address designed to conceal the fact that Bi-County PC's business address was actually a mere mailbox in a UPS store.

46.     Dr. Lewis is board certified in anesthesiology, who has had no involvement with examining any of the Insureds subjected to the Fraudulent Services, and no involvement in actually rendering the tests to any of the Insureds on behalf of Bi County PC.

47.     In keeping with the fact that the Defendants planned to use multiple entities through which to submit billing for the Fraudulent Services to evade detection of their fraudulent scheme, in March 2017, the Defendants then recruited another licensed physician, Dr. Koffler, who was willing to sell the use of his medical license to the Management Defendants so that they could secretly and unlawfully submit fraudulent No-Fault billing to GEICO and other insurers.

48.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Apollo PC to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Koffler.

49.     In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Koffler agreed to falsely represent in the certificate of incorporation and related filings with New York State for Apollo PC that he was the true shareholder, director, and officer of Apollo PC, and that he truly owned, controlled, and practiced through the professional corporation.  Dr. Koffler did this knowing that the professional corporation would be

used to submit fraudulent billing to insurers.

50.     In furtherance of the scheme to submit billing for the Fraudulent Services, in March 2017, the Defendants caused Apollo PC to be incorporated.

51.     The Defendants thereafter submitted billing to GEICO through Apollo PC for the Fraudulent Services during the period of June 2017 to February 2018.  See Exhibit "2".

52.     Apollo PC used a street address designed to conceal the fact that Apollo PC's business address was actually a mere Regus virtual office.

53.     Dr. Koffler, like Dr. Lewis, has had no involvement with examining any of the Insureds subjected to the Fraudulent Services, and no involvement in actually rendering the tests to any of the Insureds on behalf of Apollo PC.

54.     In further keeping with the fact the Defendants planned to use multiple entities through which to submit billing for the Fraudulent Services to evade detection of their fraudulent scheme, the Defendants had already incorporated another professional corporation, Island PC, using Dr. Koffler's name and license in August 2017.

55.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Island PC to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Koffler.

56.     In exchange for a designated salary or other form of compensation from the Management Defendants, Dr. Koffler agreed to falsely represent in the certificate of incorporation and related filings with New York State for Island PC that he was the true shareholder, director, and officer of Island PC, and that he truly owned, controlled, and practiced through the

professional corporation.  Dr. Koffler did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

57.     Once the Defendants decided to cease billing using Apollo PC, they then began submitting billing using Island PC, from February 2018 through present day, for the Fraudulent Services. See Exhibit "3".

58.     Island PC used a street address designed to conceal the fact that Island PC's business address was actually a mere Regus virtual office.

59.     Dr. Koffler, like Dr. Lewis, has had no involvement with examining any of the Insureds subjected to the Fraudulent Services, and no involvement in actually rendering the tests to any of the Insureds on behalf of Island PC.

60.     Notably, during relevant times herein, Dr. Koffler spent substantial time in Florida and maintained multiple healthcare practices, including two practices in Miami, Florida.

61.     Notwithstanding the Defendants' submission of billing under three different names – ostensibly separate professional "practices"– the three "practices" that operated under the names of Bi County PC, Apollo PC, and Island PC were all actually under the common ownership and control of the Management Defendants.

62.     The three "practices" that operated under the names of Bi County PC, Apollo PC, and Island PC all were operated in virtually identical fashion, with all three purporting to render the same Fraudulent Services pursuant to the same fraudulent, predetermined treatment and billing protocol.

63.     The three "practices" that operated under the names of Bi County PC, Apollo PC, and Island PC also operated sequentially such that patients were routinely transferred from Bi

County PC to Apollo PC, and thereafter from Apollo PC to Island PC.

64.     The monies paid to, and collected by, the three "practices" that operated under the names of Bi County PC, Apollo PC, and Island PC all were controlled by the same persons, *i.e.*, the Management Defendants.

65.     In fact, the checks that GEICO issued for payment to Bi County PC were endorsed for deposit on behalf of Bi County PC by the same person who endorsed for deposit the checks that GEICO issued for payment to Apollo PC and Island PC.

66.     The three "practices" that operated under the names of Bi County PC, Apollo PC, and Island PC all used the same type of business address designed to conceal the fact that they were operated from nothing more than either a mailbox store or virtual office.

67.     The three "practices" that operated under the names of Bi County PC, Apollo PC, and Island PC all used the same technicians to render, or purport to render, the Fraudulent Services at a series of multidisciplinary medical clinics organized to exploit Insureds' no-fault benefits (the "Clinics").

68.     The Clinics were located at the following locations:

- 175-43 Hillside Avenue, Jamaica
- 1610 Castle Hill Avenue, Bronx
- 1570 Old Country Road, Westbury
- 320 Post Avenue Suite 100, Westbury
- 279 Burnside Avenue, Lawrence
- 27-51 27th Street, Astoria
- 64-33 98th Street, Rego Park
- 210 E. Sunrise Highway Suite 101, Valley Stream
- 2260 Hewlett Avenue, Merrick
- 56A Motor Avenue, Farmingdale
- 195 Park Avenue, Bethpage
- 1 John Street, Babylon
- 160 Old Country Road, Riverhead

69.     The Physician Defendants did not have their own patients, and instead relied on the patient base provided by the Clinics.

70.     The Physician Defendants did virtually nothing that would be expected of the owner of a legitimate healthcare professional corporation or medical practice to attract patients in connection with their operations at the Clinics.

71.     The Management Defendants, rather than the Physician Defendants, created and controlled the practices ran under the names of the PC Defendants.

72.     The Management Defendants, rather than the Physician Defendants, provided all start-up costs and investment in the PC Defendants.

73.     The Management Defendants, rather than the Physician Defendants, determined which Clinics the PC Defendants would operate from.

74.     The Management Defendants, rather than the Physician Defendants, controlled the day-to-day operations of the PC Defendants.

75.     The Management Defendants, rather than the Physician Defendants, controlled the financial operations and arrangements of the PC Defendants, including the profits therefrom.

76.     The Physician Defendants never were the true shareholders, directors, or officers of the PC Defendants listed under their name, and never had any true ownership interest in or control over the professional corporations.

77.     True ownership and control over the PC Defendants always rested entirely with the Management Defendants, who used the façade of Bi-County PC, Apollo PC, and Island PC to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

78.     The Physician Defendants exercised absolutely no control over or ownership interest in the PC Defendants listed under their names.  All decision-making authority relating to the operation and management of the PC Defendants vested entirely with the Management Defendants.

79.     In addition, the Physician Defendants never controlled or maintained any of the PC Defendants' books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the PC Defendants' financial affairs; never hired or supervised any of the PC Defendants' employees or independent contractors; and were completely unaware of the fundamental aspects of how the PC Defendants operated.

80.     The Physician Defendants were, at best, gloried employees of the Management Defendants.

81.     The Management Defendants have, at all relevant times, concealed their identities and associations with Bi-County PC, Apollo PC, Island PC and the Physician Defendants.

**C.      The Failure to Practice Medicine Through the PC Defendants**

82.     N.Y. Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

> Issuance of shares
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation...or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are

18

issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

83.     Legislative history confirms that a medical professional corporation's putative physician-owner not only must be licensed to practice medicine but must also be engaged in the practice of medicine through the medical professional corporation.  For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

1.     Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.

> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

2.     New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged….  (Emphasis added.)

Copies of the memoranda referenced above, collectively are annexed hereto as Exhibit "4."

84.     In keeping with the fact that the Physician Defendants had no genuine ownership interest in or control over the PC Defendants, the Physician Defendants did not actually practice medicine through the PC Defendants.

85.     None of bills submitted to GEICO through the PC Defendants were for services actually performed by the Physician Defendants.

86.     Rather, to the extent that the Fraudulent Services were performed in the first instance, they were performed by technicians or others without oversight by the Physician Defendants.

### D.     The Illegal Kickback and Referral Relationships with the Clinics

87.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

88.     The Clinics housed an intentionally ever-changing number of medical professional corporations, chiropractic professional corporations, physical therapy professional corporations and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

89.     In fact, GEICO received billing from many of the Clinics from a "revolving door" of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

90.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 1570 Old Country Road, Westbury, NY from a "revolving door" of approximately 20 different healthcare providers.

91.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 279 Burnside Avenue, Lawrence, NY from a "revolving door" of approximately 20 different health care providers.

92.     Similarly, GEICO has received billing for purported healthcare services rendered at the Clinic located at 56A Motor Avenue, Farmingdale, NY from a "revolving door" of approximately 10 different health care providers.

93.     In addition, regardless of the Clinic or the referring doctor, the letters of medical necessity allegedly drafted and signed by the doctors that purported to refer the Clinics' patients to the PC Defendants are boilerplate letters that are virtually identical.

94.     The Defendants, in order to obtain access to the patient bases at the Clinics, entered into illegal financial arrangements with persons associated with the Clinics at the direction of the Management Defendants. These illegal financial arrangements included kickbacks to the owners and controllers of the various Clinics, entering into illegal payment for referral arrangements, and/or permitting unlicensed laypersons to impermissibly share in professional fees, which resulted in payments of large sums of monies to the persons associated with the Clinics.

95.     The kickbacks and payments for patient referrals paid by the Defendants to the persons associated with the Clinics were disguised as fees to "rent" space or personnel from the Clinics. In fact, these were "pay-to-play" arrangements that caused the owners and controllers of the Clinics to provide access to Insureds and to steer Insureds so that they could be subjected to medically unnecessary services that were billed under the names of Bi County PC, Apollo PC, and Island PC.

96.    To the extent that the Defendants entered into written lease or other agreements with persons associated with the Clinics, the agreements were shams in that they did not mandate a fixed rental amount throughout the term of the agreement consistent with arms-length commercial rental arrangements, but instead permitted the upward or downward adjustment of fees that, despite boilerplate language to the contrary, reflected the volume of referrals from the Clinics to Bi County PC, Apollo PC, and Island PC.

97.    Further, to the extent that the Defendants entered into written lease or other agreements with persons associated with the Clinics, the agreements were shams in that the agreements were not for space dedicated for use by the PC Defendants, could be terminated by either party without cause or without specifying any reason, and provided for rental amounts that were not consistent with the fair market value of the space purportedly used by the PC Defendants, which typically consisted of use one day per month when referrals from the Clinics were to be made to the PC Defendants.

98.    In exchange for the kickbacks and illegal financial payments, when an Insured visited one of the Clinics, he or she was automatically referred for the medically unnecessary Fraudulent Services, rendered under the names of Bi County PC, Apollo PC, and Island PC, regardless of the individual's symptoms, presentment, or actual need for additional treatment or testing.

99.    The amounts paid by the Defendants to the owners and controllers of the various Clinics were based on the volume of Insureds that the Clinics would refer for the purported medically unnecessary services.

100.    The unlawful kickback and payment arrangements were essential to the success of

the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers for the Fraudulent Services.

101. The Physician Defendants – like the Management Defendants – knew that these arrangements were illegal and were therefore complicit in taking affirmative steps to conceal the existence of the fraudulent referral scheme.

102. There was no substantive difference in the operation of the fraudulent scheme notwithstanding the change in the names used by the Defendants to bill GEICO, whether billed under Bi County PC, Apollo PC, or Island PC. See Exhibits "1" - "3".

103. The fraudulent treatment and billing protocol continued, unchanged, from Bi County PC to Apollo PC, and from Apollo PC to Island PC.

104. In general, Insureds initially purportedly received treatment rendered under the name of Bi County PC from Dr. Lewis. Thereafter, in or about May 2017, the Insureds were "transferred" from Bi County PC to Apollo PC, to the extent the Insureds were still receiving treatment, or purporting to receive treatment. See Exhibits "1" - "2".

105. For example:

    (i)    On September 14, 2016, October 24, 2016, and February 6, 2017, an insured named JR was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway, Suite 101, Valley Stream, which was billed under the name of Bi County PC. On June 6, 2017, JR was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Apollo PC.

    (ii)    On February 17, 2017 and April 14, 2017, an Insured named MR was purportedly provided with computerized range of motion and muscle

strength testing at the Clinic located at 160 Old Country Road, Riverhead which was billed to GEICO under the name of Bi County PC. Then, on June 16, 2017, MR purportedly received computerized range of motion and muscle strength testing at the same Clinic, but the charges were then submitted to GEICO under the name Apollo PC.

(iii)    On February 27, 2017 and March 28, 2017, an insured named FL was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway, Suite 101, Valley Stream, which was billed under the name of Bi County PC.  On May 8, 2017, FL was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Apollo PC.  Then, on August 28, 2017, FL was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was again billed to GEICO under the name of Apollo PC.

(iv)    On March 22, 2017 and April 19, 2017, an insured named JML was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed under the name of Bi County PC.  On May 15, 2017, JML was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Apollo PC.  Then, on September 6, 2017, JML was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was again billed to GEICO under the name of Apollo PC.

(v)    On April 12, 2017, an insured named JPL was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Bi County PC.  On May 24, 2017, JPL was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Apollo PC.  Then, on July 28, 2017, JPL was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was again billed to GEICO under the name of Apollo PC.

106.    These are only representative examples. The Defendants routinely acted to transfer the billing for the Fraudulent Services from Bi County PC to Apollo PC, and continued to operate pursuant to the same fraudulent, pre-determined treatment and billing protocol, in

furtherance of the fraudulent scheme.

107.    To further limit the duration of time through which any one professional corporation was used to submit billing for the Fraudulent Services, thereby evading detection of their fraudulent scheme, in or about January 2018, the Insureds were further "transferred" from Apollo PC to Island PC, to the extent the Insureds were still receiving treatment, or purporting to receive treatment.  See Exhibits "2" - "3".

108.    For example:

(i)     On June 14, 2017, August 7, 2017, and October 16, 2017, an insured named MG was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed under the name of Apollo PC. On January 22, 2018, MG was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(ii)    On July 26, 2017, October 4, 2017, and November 8, 2017, an insured named KM was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed under the name of Apollo PC. On January 22, 2018, KM was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(iii)   On August 14, 2017 and November 27, 2017, an insured named JTM was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway Suite 100, Valley Stream, which was billed under the name of Apollo PC. On February 19, 2018, JTM was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(iv)    On September 14, 2017 and October 12, 2017, an insured named KR was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 175-43 Hillside Avenue, Jamaica, which was billed under the name of Apollo PC. On January 17, 2018, KR was purportedly provided with computerized range of motion and muscle

strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(v)    On September 20, 2017 and November 6, 2017, an insured named CC was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On January 3, 2018, CC was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(vi)    On September 20, 2017, October 23, 2017, and November 29, 2017, an insured named LG was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On January 29, 2018, LG was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(vii)    On October 4, 2017, November 6, 2017, and December 4, 2017, an insured named TSB was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On January 3, 2018, TSB was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(viii)    On October 4, 2017, November 8, 2017, and December 6, 2017, an insured named MS was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed under the name of Apollo PC. On January 10, 2018, MS was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(ix)    On October 20, 2017 and November 17, 2017, an insured named EAM was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 160 Old Country Road, Riverhead, which was billed under the name of Apollo PC. On January 12, 2018, EAM was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(x)     On October 23, 2017 and December 11, 2017, an insured named TM was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway Suite 100, Valley Stream, which was billed under the name of Apollo PC. On January 8, 2018, TM was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xi)    On November 6, 2017 and December 4, 2017, an insured named DP was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On January 3, 2018, DP was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xii)   On November 6, 2017, December 4, 2017, and January 3, 2018, an insured named PG was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On February 7, 2018, PG was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xiii)  On November 13, 2017 and December 11, 2017, an insured named SB was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway Suite 100, Valley Stream, which was billed under the name of Apollo PC. On February 5, 2018, SB was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xiv)   On November 15, 2017 and December 18, 2017, an insured named JL was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 320 Post Avenue Suite 100, Westbury, which was billed under the name of Apollo PC. On January 17, 2018, JL was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xv)    On November 17, 2017 and December 11, 2017, an insured named AT was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 160 Old Country Road, Riverhead, which was billed under the name of Apollo PC. On January 12, 2018, AT

was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xvi)    On November 27, 2017 and December 20, 2017, an insured named ED was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed under the name of Apollo PC. On January 22, 2018, ED was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xvii)    On November 27, 2017, an insured named TM was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway Suite 100, Valley Stream, which was billed under the name of Apollo PC. On January 8, 2018, TM was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xviii)  On November 29, 2017, an insured named NA was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On January 29, 2018, NA was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xix)    On December 18, 2017, an insured named VP was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 210 E. Sunrise Highway Suite 100, Valley Stream, which was billed under the name of Apollo PC. On February 5, 2018, VP was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xx)    On December 20, 2017, an insured named SD was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On February 14, 2018, SD was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xxi)   On December 20, 2017, an insured named ME was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 1570 Old Country Road, Westbury, which was billed under the name of Apollo PC. On January 29, 2018, ME was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

(xxii)  On December 20, 2017, an insured named LF was purportedly provided with computerized range of motion and muscle strength testing at the Clinic located at 56A Motor Avenue, Farmingdale, which was billed under the name of Apollo PC. On January 22, 2018 and February 19, 2018, LF was purportedly provided with computerized range of motion and muscle strength testing at the same Clinic, which was billed to GEICO under the name of Island PC.

109.    These are only representative examples.   The Defendants routinely acted to transfer the billing for the Fraudulent Services from Apollo PC to Island PC, and have continued through the present day to operate pursuant to the same fraudulent, pre-determined treatment and billing protocol, in furtherance of the fraudulent scheme.

110.    In keeping with the fact that the Insureds were "transferred" from Apollo PC to Island PC solely to reduce the amount of billing submitted by the Defendants through any single tax identification number, thereby preventing GEICO from identifying the fraudulent scheme and the pattern of fraudulent charges submitted through any one entity, Dr. Koffler purportedly owns and controls both Apollo PC and Island PC; Dr. Koffler is the purported treating provider on the bills submitted to GEICO by both Apollo PC and Island PC; Apollo PC and Island PC have the same address; Apollo PC and Island PC employ the same technicians; and Island PC began purportedly rendering services to patients on January 3, 2018, the last purported date of service for Apollo PC.

111.    Additionally, in keeping with the fact that Island PC is merely a continuation of

the fraudulent scheme implemented by the Management Defendants using Apollo PC, Island PC submitted a bill to GEICO listing Apollo PC's tax identification number, 82-1584090.  See Exhibit "5."

E.     **The Defendants' Fraudulent Treatment and Billing Protocol**

112.    The Defendants implemented a fraudulent treatment and billing protocol without regard to the genuine needs of the patients as part of their scheme to submit inflated and excessive charges for the Fraudulent Services billed under the PC Defendants' tax identification numbers.

113.    The Defendants scheme involved subjecting virtually every Insured to a pre-determined fraudulent treatment protocol that was rendered regardless of the nature of the accidents, the actual medical needs of the Insureds, or the Insureds' individual symptoms or presentment.

114.    Each step in the Defendants' pre-determined fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

115.    No legitimate physician, exercising independent medical judgment, would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

116.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1.   The Fraudulent Range of Motion and Muscle Strength Testing

117.   In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Defendants purported to subject every Insured to medically unnecessary computerized range of motion and muscle strength testing ("ROM/MT").

118.   The Physician Defendants purported to perform ROM/MT on virtually every Insured, which was then billed to GEICO under the PC Defendants.

119.   Like the Defendants' charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that: (i) the ROM/MT were duplicative and medically unnecessary; (ii) the Defendants unbundled the charges for the ROM/MT to fraudulently inflate the charges for ROM/MT that they submitted to GEICO by an order of magnitude; and (iii) the ROM/MT were performed – to the extent that they were performed at all – pursuant to the Defendants pre-determined fraudulent billing and treatment protocol and the improper referral and financial arrangements between and among the Defendants.

### a.   Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

120.   The adult human body is made up of 206 bones joined together at various joints that are either of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend at a knee, rotate a shoulder, or move the neck to one side.

121.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount of movement at the joint.

122.   A traditional, or manual, range of motion test consists of a non-electronic

measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

123.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

124.    Physical evaluations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide a point of reference for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, the physician will be substantially limited in their ability to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" evaluation of a trauma patient.

125.    Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial and follow-up examinations.

126.    In other words, healthcare providers cannot conduct and bill for initial examinations and follow-up examinations, which include range of motion and muscle testing,

then bill separately for duplicative, contemporaneously-provided range of motion and muscle strength tests.

**b.     The Defendants' ROM/MT was Duplicative and Medically Unnecessary**

127.   To the extent that the Insureds actually received the initial examinations and follow-up examinations at the Clinics that were billed to GEICO, the Insureds received manual range of motion tests and manual muscle strength tests during those examinations. .

128.    The charges for the manual range of motion and manual muscle strength tests and were part and parcel of the charges that the healthcare providers at the Clinics routinely submitted or caused to be submitted for initial examinations and follow-up examinations.

129.   Despite the fact that the Defendants knew that the Insureds already purportedly had undergone manual range of motion and muscle strength testing during their initial examinations and follow-up examinations, the Defendants systemically billed for, and purported to provide, ROM/MT to Insureds.

130.   The Defendants purported to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements.  The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during the initial and follow-up examinations, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

131.   The Defendants purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the

computerized range of motion tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

132.   The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of each Insured's initial examinations and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless.

133.   While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the Defendants, it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually all the Insureds' initial and follow-up examinations.

134.   In keeping with the fact that the ROM/MT were medically useless, the results of the ROM/MT purportedly conducted by Dr. Koffler through both Apollo PC and Island PC were not reviewed until weeks after the ROM/MT were performed, and therefore provided limited diagnostic value.

135.   The ROM/MT was rendered pursuant to a pre-established protocol that: (i) did not aide in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

c. **The Defendants Fraudulently Unbundled Charges for the ROM/MT**

136.    Not only did the Defendants deliberately purport to provide duplicative, medically unnecessary ROM/MT, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

137.    Pursuant to the Fee Schedule, when ROM/MT are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

138.    CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes", identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas.  These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation.  They also include creation of a written report.

139.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed.  Thus, if a provider performed 15 minutes of ROM/MT, it would be permitted a single charge of $45.71 for the ROM/MT under CPT code 97750.  If the provider performed 30 minutes of ROM/MT, it would be permitted to submit two charges of $45.71 for the ROM/MT under CPT code 97750, resulting in total charges of $91.42, and so forth.

140.    The Defendants routinely purported to provide ROM/MT to Insureds on the same dates of service.

141.    To the extent that the Defendants actually provided the ROM/MT to Insureds in

the first instance, the computerized range of motion and muscle strength tests – together – never took more than 15 minutes to perform. Thus, even if the ROM/MT that the Defendants purported to provide were medically necessary, and were performed in the first instance, the Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed ROM/MT on an Insured.

142.    In order to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, the Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle strength testing into: (i) multiple charges of $45.75 under CPT code 95851 (for the range of motion tests); and (ii) multiple charges of $43.60 under CPT code 95831(for the muscle strength tests).

143.    By unbundling what should – at most – have been two charges of $45.71 under CPT code 97750 into multiple charges under CPT codes 95851 and 95831, the Defendants typically inflated the fraudulent ROM/MT charges that they submitted to GEICO by an order of magnitude. The Defendants routinely submitted billing for ROM/MT rendered to an Insured on a single date of service for $985.00 for each session of medically unnecessary computerized range of motion and muscle strength testing.

    d.    **The Defendants Fraudulently Misrepresented the Existence of Written, Interpretive Reports Regarding the ROM/MT**

144.    Not only were the Defendants' charges for the ROM/MT fraudulent because the tests were duplicative, medically unnecessary, and because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that the Defendants prepared written reports interpreting the test data.

145.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle strength testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

146.    The CPT Assistant states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851 and 95852".

147.    The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle strength testing.

148.    Though the Defendants routinely submitted billing for the computerized range of motion and muscle strength tests using CPT codes 95831 and 95851, the Defendants did not prepare written reports interpreting the data obtained from the tests.

149.    Therefore, even if the Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT codes 95831 and 95851 – and they did not – the Defendants' billing still would not be in compliance with the Fee Schedule due to a failure to submit a separate, distinctly identifiable, and signed written report interpreting the results of the purported ROM/MT for any of the Insureds.

150.    The Defendants did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment.  Rather, to the extent they were performed at all, the ROM/MT were performed as part of the Defendants'

pre-determined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

**III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

151.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of bills, NF-3 forms and treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

152.    The bills, NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The bills, NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the PC Defendants are not properly licensed in that they were controlled by unlicensed laypersons and had nominal physician-owners who did not practice medicine through them.

(ii)    The bills, NF-3 forms and treatment reports uniformly misrepresented to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).   In fact, the PC Defendants engaged in illegal fee splitting, kickback, and referral arrangements.

(iii)    The bills, NF-3 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services actually were performed, and that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, rather than to genuinely treat the Insureds.

(iv)    The bills, NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of service and the nature of the service that purportedly was provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

153.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

154.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

155.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the PC Defendants and the Physician Defendants' were in violation of licensing laws and engaged in illegal fee-splitting and kickback arrangements, and therefore are ineligible to bill for or collect No-Fault Benefits.

156.    The Defendants likewise knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them.

157.    In addition, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly concealed the fact that the Defendants misrepresented and exaggerated the level and nature of the services purportedly provided, and inflated the billing to GEICO.

158.    In fact, the Defendants used deceptive office addresses, which were actually mailbox stores or virtual offices, to appear as legitimate, and also billed for the Fraudulent

Services through multiple entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single entity or under any single tax identification number, thereby preventing GEICO from identifying the fraudulent scheme and the pattern of fraudulent charges submitted through any one entity.

159.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

160.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

161.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

162.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $70,000.00 based upon the fraudulent charges.

163.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment-28 U.S.C. §§ 2201 and 2202)**

164.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

165.   There is an actual case in controversy between GEICO and the Defendants regarding more than $752,000.00 in pending fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the names of the PC Defendants, including $340,869.00 in pending fraudulent billing submitted by Bi-County PC, $243,776.00 in pending fraudulent billing submitted by Apollo PC, and $167,897.00 in pending fraudulent billing submitted by Island PC.

166.   The Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants were unlawfully controlled by unlicensed laypersons and engaged in illegal fee-splitting and kickback arrangements and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

167.   The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services billed were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

168.   The Defendants have no right to receive payment for any pending bills submitted to

GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

169.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the alleged owners of the PC Defendants did not practice through the professional corporations as physician-owners are required by New York law.

170.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants the PC Defendants were unlawfully controlled by unlicensed laypersons and illegally shared fees with them and, therefore, were ineligible to bill for or to collect No-Fault Benefits;

(ii)    the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants because the PC Defendants engaged in illegal fee-splitting, kickback, and referral arrangements and, therefore, were ineligible to bill for or to collect No-Fault Benefits;

(iii)   the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants because the Fraudulent Services were medically unnecessary and were ordered pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to GEICO and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them;

(iv)    the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants because the CPT codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(v)     the Defendants have no right to receive payment for any pending bills submitted to GEICO because the alleged owners of the PC Defendants did

42

not practice through the professional corporations as physician-owners are required by New York law.

## SECOND CAUSE OF ACTION
### Against Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10"
### (Common Law Fraud)

171.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

172.    Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

173.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Bi County PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact unlicensed laypersons unlawfully controlled Bi County PC, which had a nominal owner who did not practice medicine through the professional corporation; (ii) in every claim, the representation that Bi County PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting, kickback, and referral arrangements; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and – to the extent they were performed at all – were provided and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service

43

provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

174.    Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Bi County PC that were not compensable under the No-Fault Laws.

175.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $37,244.00 pursuant to the fraudulent bills submitted by the Defendants through Bi County PC.

176.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

177.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10"**
**(Unjust Enrichment)**

178.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

179.    As set forth above, Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

180.    When GEICO paid the bills and charges submitted by or on behalf of Bi County PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments

based on the Defendants' improper, unlawful, and/or unjust acts.

181.    Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

182.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

183.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $37,244.00.

## FOURTH CAUSE OF ACTION
### Against Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10"
### (Common Law Fraud)

184.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

185.    Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

186.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Apollo PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact unlicensed laypersons unlawfully controlled Apollo PC, which had a nominal owner who did not practice medicine through the professional corporation; (ii) in every claim, the representation that Apollo PC was properly licensed, and therefore, eligible

to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting, kickback, and referral arrangements; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and – to the extent they were performed at all – were provided and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

187.    Apollo  PC, Dr. Koffler, and John Doe Defendants "1" – "10" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Apollo PC that were not compensable under the No-Fault Laws.

188.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $23,668.00 pursuant to the fraudulent bills submitted by the Defendants through Apollo PC.

189.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

190.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10"**
**(Unjust Enrichment)**

191.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

192.    As set forth above, Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

193.    When GEICO paid the bills and charges submitted by or on behalf of Apollo PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

194.    Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

195.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

196.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $23,668.00.

**SIXTH CAUSE OF ACTION**
**Against Island PC, Dr. Koffler, and John Doe Defendants "1" – "10"**
**(Common Law Fraud)**

197.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

198.    Island PC, Dr. Koffler, and John Doe Defendants "1" – "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

Case 2:18-cv-03649-DRH-ARL   Document 1   Filed 06/22/18   Page 48 of 51 PageID #: 48

facts from GEICO in the course of their submission of bills seeking payment for the Fraudulent Services.

199.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Island PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact unlicensed laypersons unlawfully controlled Island PC, which had a nominal owner who did not practice medicine through the professional corporation; (ii) in every claim, the representation that Island PC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting, kickback, and referral arrangements; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and – to the extent they were performed at all – were provided and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided.

200.    Island PC, Dr. Koffler, and John Doe Defendants "1" – "10" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Island PC that were not compensable under the No-Fault Laws.

201.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $9,113.00 pursuant to the fraudulent bills submitted by

48

the Defendants through Island PC.

202.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

203.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
### Against Island PC, Dr. Koffler, and John Doe Defendants "1" – "10"
### (Unjust Enrichment)

204.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

205.     As set forth above, Island PC, Dr. Koffler, and John Doe Defendants "1" – "10" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

206.     When GEICO paid the bills and charges submitted by or on behalf of Island PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

207.     Island PC, Dr. Koffler, and John Doe Defendants "1" – "10" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

208.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

209.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $9,113.27.

## JURY DEMAND

210.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Bi County PC, Apollo PC, and Island PC have no right to receive payment for any pending bills, totaling approximately $752,000.00, submitted to GEICO;

B.    On the Second Cause of Action against Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $37,244.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

C.    On the Third Cause of Action against Bi County PC, Dr. Lewis, and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $37,244.00, together with costs, interest and such other and further relief as this Court deems just and proper.

D.    On the Fourth Cause of Action against Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $23,668.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

E.      On the Fifth Cause of Action against Apollo PC, Dr. Koffler, and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $23,668.00, together with costs, interest and such other and further relief as this Court deems just and proper.

F.      On the Sixth Cause of Action against Island PC, Dr. Koffler, and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $9,113.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

G.      On the Seventh Cause of Action against Island PC, Dr. Koffler, and John Doe Defendants "1" – "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $9,113.00, together with costs, interest and such other and further relief as this Court deems just and proper.

Dated:  June 22, 2018

RIVKIN RADLER LLP

By: _____
        Barry I. Levy (BL 2190)
        Michael A. Sirignano (MS 5263)
        Garin Scollan (GS 7780)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company, and GEICO
Casualty Company*